**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 24, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JASON FABRIZIUS; FABRIZIUS
LIVESTOCK LLC,

     Petitioners,

v.

UNITED STATES DEPARTMENT
OF AGRICULTURE,

     Respondent.

No. 23-9570

_____

**Petition for Review of an Order from the Department of Agriculture**
**(Department No. 21-J-0062)**
_____

Thomas D. Grant, Grant and Associates, P.C., Greeley, Colorado, for
Petitioners.

Kevin J. Kennedy, U.S. Department of Justice, Washington, DC, Attorney,
Appellate Staff (Brian M. Boynton, Principal Deputy Assistant Attorney, and
Mark B. Stern, Attorney, Appellate Staff, U.S. Department of Justice,
Washington, DC, and Matthew W. Walton, Attorney Advisor, Danielle Park,
and John V. Rodriguez, Trial Attorneys, Department of Agriculture,
Washington, DC, with him on the brief), for Respondent.
_____

Before **TYMKOVICH**, **McHUGH**, and **ROSSMAN**, Circuit Judges.
_____

**ROSSMAN**, Circuit Judge.
_____

Petitioners Jason Fabrizius and Fabrizius Livestock LLC (Fabrizius Livestock) seek this court's review of a May 30, 2023 order by a United States Department of Agriculture (USDA) Judicial Officer. That order denied an appeal of two USDA Administrative Law Judge (ALJ) orders: one finding Fabrizius Livestock is among the "persons responsible" for ensuring animals transported interstate have certain required documentation, and one issuing a $210,000 fine against the company. Exercising jurisdiction under 7 U.S.C. § 8313(b)(4)(A), we deny the petition for review.

## I[1]

### A

Mr. Fabrizius is an experienced horse dealer. He is the sole owner of Fabrizius Livestock,[2] a Colorado corporation that buys and sells horses, mostly intended for slaughter. The corporation kept many of the horses it sold in a "kill pen," an enclosure that left the animals particularly

---

[1] We mostly take the facts from the Judicial Officer order on review, with some elaboration from the ALJ orders and other uncontested parts of the record.

[2] The only entity USDA fined is "Fabrizius Livestock," with no "LLC." The petitioning parties, in contrast, are "Jason Fabrizius" and "Fabrizius Livestock LLC." At oral argument, the petitioners' counsel confirmed "Fabrizius Livestock" and "Fabrizius Livestock LLC" are the same entity. Oral Arg. at 15:25–15:46. We proceed on that understanding. Notwithstanding the new "LLC" label on appeal, Fabrizius Livestock is a corporation. *See* RII.328 (calling the company a "corporation"); Op. Br. at ii (same).

vulnerable to spreading disease. Fabrizius Livestock is a family affair; Mr. Fabrizius's partner, Amanda McMillan, helps him with the business when she is not tending to their two children, and Mr. Fabrizius pays for the family's expenses using the business accounts.

Selling horses across state lines involves paperwork. Three specific kinds bear mentioning. *First*, owner-shipper certificates help track horses sold commercially for slaughter. *See* 9 C.F.R. § 88.4(a)(3) (2024). *Second*, interstate certificates of veterinary inspection (ICVIs) help with disease-tracing efforts for livestock transported across state lines. *See id.* § 86.5. These "ICVIs are used in the investigation of animal disease exposure and response efforts like trace-back to identify the source of infection." RII.328. ICVIs both "provide information about the movement of livestock from one location to another" and "record information from an attending veterinarian about an animal's health status and potential exposure to disease." RII.329. *Third*, tests for equine infectious anemia (EIA) verify a horse is not infected with that often deadly and highly communicable disease, which lacks a vaccine or known treatment. *See generally* 9 C.F.R. § 75.4.

Fabrizius Livestock sold horses to a variety of buyers, including for slaughter, and often marketed the horses on Facebook. The business often discussed regulatory requirements for shipping horses with buyers and transporters, though often only after the other party asked. On its Facebook

page, Fabrizius Livestock "clearly state[d] to potential buyers that the buyers will be responsible for making sure that any horses that will be transported out of the state will have the necessary paperwork." RI.14 ¶ 26. Still, the company occasionally provided buyers with some of the requisite documentation, including EIA test results. It also sometimes helped buyers load horses for transport.

Fabrizius Livestock's financial condition is somewhat unclear from the record. While it had negative income from 2015 to 2021, it has invested more than $340,000 in business upgrades since 2018. "Th[e] comingling of business and personal expenses compounds the difficulty in making an accurate assessment of [Fabrizius Livestock's] current finances." RII.348.

From here on, for brevity, we refer to Mr. Fabrizius and Fabrizius Livestock collectively as "Fabrizius."

## B

### 1

The industry in which Fabrizius operates is federally regulated. For purposes of this case, two statutes are particularly relevant. *First*, the Commercial Transportation of Equine for Slaughter Act (CTESA) empowers "the Secretary of Agriculture to issue guidelines for the regulation of the commercial transportation of equine for slaughter by persons regularly engaged in that activity within the United States." 7 U.S.C. § 1901 note

4

(Commercial Transportation of Equine for Slaughter) (quoting Pub. L. No. 104-127, § 901, 110 Stat. 888, 1184 (1996)). Acting under that authority, USDA requires each commercially transported horse's owner or shipper to "[c]omplete and sign an owner-shipper certificate" providing information on the shipper, destination, conveyance, and horse, and helping ensure the horse's welfare during transportation. 9 C.F.R. § 88.4(a)(3). Each violation of that or other CTESA regulations can yield a civil penalty of up to $5,000. *Id.* § 88.6(a). "Each equine transported in violation of the [CTESA] regulations . . . will be considered a separate violation." *Id.* § 88.6(b).

**2**

*Second*, Congress passed the Animal Health Protection Act (AHPA) to "prevent[], detect[], control, and eradicat[e] . . . diseases and pests of animals." 7 U.S.C. § 8301(1). It found these actions "essential to" promoting, *inter alia*, "animal health," "the economic interests of the livestock and related industries," and "interstate . . . and foreign commerce . . . in animals and other articles." *Id.* § 8301(1)(A), (C), (E).

To effect these goals, the AHPA empowers the Secretary of Agriculture to "prohibit or restrict . . . the movement in interstate commerce of any animal . . . if the Secretary determines that the prohibition or restriction is necessary to prevent the introduction or dissemination of any pest or disease of livestock." *Id.* § 8305(1). The AHPA defines "move"

5

broadly; it means "to carry, enter, import, mail, ship, or transport," and "to aid, abet, cause, or induce" any of those actions. *Id.* § 8302(12)(A)–(B). Finally, the AHPA authorizes the Secretary to "promulgate such regulations, and issue such orders, as the Secretary determines necessary to carry out" those provisions. *Id.* § 8315. The Secretary has delegated his authority under this statute to USDA's Animal and Plant Health Inspection Service (APHIS). 7 C.F.R. §§ 2.22(a)(2)(xxxii), 2.80(a)(37) (2024).

Acting under AHPA authority,[3] APHIS promulgated two relevant regulations. The first prohibits selling diseased livestock across state lines. "Animals or poultry affected with" certain listed diseases, "or any other communicable disease which is endemic to the United States, . . . shall not be moved interstate." 9 C.F.R § 71.3(a). Relatedly, "[b]efore offering . . . livestock . . . for interstate transportation, . . . all persons . . . or corporations are required to exercise reasonable diligence to ascertain whether such animals . . . are affected with any contagious, infectious, or communicable disease, or have been exposed to the contagion or infection of any such disease . . . ." *Id.* § 71.3(f).

A second AHPA regulation requires certain measures to help trace disease outbreaks. It provides "[t]he persons responsible for animals leaving

---

[3] Fabrizius does not challenge USDA's statutory authority to issue any of the regulations on review.

a premises for interstate movement must ensure that the animals are accompanied by an [ICVI] or other document required by this part for the interstate movement of animals." *Id.* § 86.5(a). Mirroring the AHPA's broad statutory definition, the regulation defines "move" as "[t]o carry, enter, import, mail, ship, or transport; to aid, abet, cause, or induce carrying, entering, importing, mailing, shipping, or transporting; . . . or to allow any of these activities." 9 C.F.R. § 86.1.

Offenders can face a misdemeanor for "knowingly violat[ing]" the AHPA, or a felony for "knowingly . . . mov[ing] any animal or article[] for distribution or sale." 7 U.S.C. § 8313(a)(1)(A)–(B). In addition, "any person that violates" the AHPA can receive civil penalties, *id.* § 8313(b)(1)—which are at issue here. In deciding on a civil penalty amount, USDA:

- "[S]*hall* take into account the nature, circumstance, extent, and gravity of the violation or violations," *id.* § 8313(b)(2) (emphasis added);

- "[M]*ay* consider . . . the [violator's] ability to pay; the effect on ability to continue to do business; any history of prior violations; the degree of culpability; and such other factors as the Secretary considers to be appropriate," *id.* § 8313(b)(2)(A)–(E) (emphasis added); and

7

- May not exceed $250,000 per violation, and $500,000 total, for non-willful corporate violators, *id.* § 8313(b)(1)(A)(ii), (b)(1)(A)(iii)(I).[4]

## C

## 1

The challenged fines in this case concern a number of transactions between Fabrizius and out-of-state parties. In August 2021, APHIS filed a complaint against Mr. Fabrizius alleging three categories of violations. *First*, in July 2018, Fabrizius bought fourteen horses intended for slaughter from a seller in Nebraska and transported the animals to its facility in Colorado without preparing the owner/shipper certificates required under CTESA regulations. *See* 9 C.F.R. § 88.4(a)(3). *Second*, between June and August of 2018, in nineteen transactions, Fabrizius sold a total of fifty horses to buyers from other states without the ICVIs required under AHPA regulations, specifically § 86.5(a). *See id.* § 86.5(a), (f). *Third*, in one of those nineteen transactions, Fabrizius sold a horse that moved from Colorado to Wyoming without exercising the reasonable diligence required under AHPA regulations, specifically § 71.3(f), to confirm the horse did not carry a

---

[4] Pursuant to statute, USDA updated these figures for inflation, making the relevant maximum fines $340,131 per violation and $569,468 total. RII.342–43; *see also* 28 U.S.C. § 2461 note (Federal Civil Penalties Inflation Adjustment).

communicable disease—and the horse was, in fact, infected with EIA. *See id.* § 71.3(f).

In May 2022, an ALJ allowed APHIS to substitute Fabrizius Livestock for Mr. Fabrizius as the respondent. The ALJ characterized this as "essentially an administrative change" as "all of the material allegations, facts, and dates remain[ed] the same." RI.26.

After a variety of administrative proceedings, the parties largely agreed on the operative facts. And Fabrizius does not dispute the central facts on which our decision relies. As to the first category of violations—on the CTESA regulations—Fabrizius admitted it purchased fourteen horses intended for slaughter from Nebraska but never prepared owner/shipper certificates for them.

As to the second category of violations—failing to procure ICVIs—Fabrizius admitted it sold fifty horses, in nineteen transactions, who were then moved across state lines without ICVIs. The company's "agent" often "helped load the horses for transport." RII.337. Fabrizius also knew each horse's buyer was "from out of state based upon the PayPal payment receipts." RI.41. Each of these "horses w[as] transported 'directly' to [a] state[] outside of Colorado." RII.338 (quoting RI.43).

As to the third category of violations—on the EIA-positive horse—Fabrizius admitted the horse was moved from Colorado to Wyoming on

9

August 20, 2018. It also admitted it conducted an EIA test only that day, and the test came back positive for EIA a week later. By that time, the horse had already reached Wyoming. That positive test "resulted in state and federal officials in twelve states investing hundreds of hours of time and energy to investigate and attempt to trace the 293 horses that were potentially exposed to EIA." RII.313. Of those 293 potentially exposed horses, "sixty-seven were never successfully traced" and "may continue to spread the disease." RII.313–14. Forty-seven of Fabrizius's horses also required tracking, retesting, and quarantining.

## 2

Despite these admitted and otherwise uncontested facts, Fabrizius contested its liability to the ALJ. In arguing against liability for the ICVI failures, Fabrizius maintained it was not among "[t]he persons responsible for animals leaving a premises for interstate movement," a requirement for liability under § 86.5(a). In a July 2022 order, the ALJ disagreed, holding Fabrizius was among the "'persons responsible' within" that section. RI.45.

The ALJ then held a virtual evidentiary hearing over two nonconsecutive days in August and September 2022. That November, the ALJ issued a second order, now finding Fabrizius liable for all alleged CTESA and AHPA violations and issuing a $210,000 civil fine. To reach that fine, the ALJ assessed a $10,000 penalty for each of (i) the fourteen horses

10

transported without owner/shipper certificates required by the CTESA (all together, for $10,000 total);[5] (ii) the nineteen AHPA violations related to the ICVIs (separately, for $190,000 total); and (iii) the single AHPA violation related to the EIA-positive horse.

## 3

Fabrizius appealed both ALJ orders—finding Fabrizius was among the "persons responsible" and imposing liability and a civil fine—to a USDA Judicial Officer. Notably, Fabrizius contested its liability *only* regarding the ICVI-related AHPA regulation, *not* the CTESA regulation or the EIA-related AHPA regulation. Fabrizius raised five arguments to the Judicial Officer:

> 1. The ALJ erred in finding that 9 C.F.R. § 86.5(a) is constitutional and not void for vagueness;
>
> 2. The ALJ erred in finding that Respondent was [among the] "persons responsible" for interstate movement as defined in 9 C.F.R. § 86.5;
>
> 3. The ALJ erred in imposing a civil penalty when Respondent did not have adequate notice in violation of its rights to due process;

---

[5] The ALJ found Fabrizius liable for only "one violation of" CTESA regulations. RII.312. But those regulations clarify "[e]ach equine transported in violation of the [CTESA] regulations . . . will be considered a separate violation." 9 C.F.R. § 88.6(b) (2024). Thus, because Fabrizius admitted to transporting fourteen horses without owner/shipper certificates, the Judicial Officer later reasonably found Fabrizius "committed 14 separate violations of the CTESA." RII.343 n.70.

4. The ALJ erred in imposing a fine against Respondent in the amount of $210,000 which was both arbitrary and capricious; and

5. The ALJ imposed a fine against Respondent which was an excessive fine under the Eighth Amendment of the United States Constitution.

RII.331–32.

The Judicial Officer rejected each argument, affirming both ALJ orders in full. He found (1) the ICVI-related AHPA regulation, § 86.5(a), "is not unconstitutionally vague and provides adequate notice to satisfy due process," RII.333; (2) § 86.5(a) "include[s] the seller," and thus Fabrizius, as part of "persons responsible," RII.333, 336; (3) Fabrizius had constitutionally "adequate notice that" it was among the "persons responsible," RII.339; (4) "the $210,000 civil penalty assessed by the ALJ . . . is authorized by applicable law and justified by the facts in this proceeding" and thus is not "arbitrary and capricious," RII.341; and (5) "the $210,000 civil penalty is not constitutionally excessive" under "the Eighth Amendment," RII.351.

This timely petition for review followed. On appeal, Fabrizius raises the same five arguments advanced to the Judicial Officer.

## II

We now proceed to the merits. We will first explain the scope of our review and then address each of Fabrizius's arguments in turn.

12

## A

The Administrative Procedure Act (APA) largely governs our review of final agency action, including the Judicial Officer's order.[6] *See* 5 U.S.C. § 704. The APA requires us to "hold unlawful and set aside" certain "agency action, findings, and conclusions." *Id.* § 706(2). As relevant to this appeal, we must "set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and those that are "contrary to constitutional right, power, privilege, or immunity." *Id.* § 706(2)(A)–(B).

When we review an agency action for arbitrariness, "[o]ur 'inquiry under the APA must be thorough, but the standard of review is very deferential to the agency.'" *OXY USA Inc.* v. *U.S. Dep't of the Interior*, 32 F.4th 1032, 1044 (10th Cir. 2022) (quoting *Hillsdale Env't Loss Prevention, Inc.* v. *U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1165 (10th Cir. 2012)). We are "not to substitute [our] judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S.* v. *State*

---

[6] Neither party disputes that the Judicial Officer's order is a final agency action subject to APA review.

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines* v. *United States,* 371 U.S. 156, 168 (1962)).

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.*

> Under this standard, we ask whether the agency's interpretation of the regulations at issue was based on an examination of the relevant evidence and if the agency "articulated a rational connection between the facts found and the decision made." We may reject the agency's interpretation only when the interpretation is unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning.

*OXY USA*, 32 F.4th at 1044 (quoting *Payton* v. *U.S. Dep't of Agric.*, 337 F.3d 1163, 1168 (10th Cir. 2003)).

When we review an agency action for constitutionality, however, our standard of review differs. "Although we generally grant considerable deference to agency action, '[w]e review de novo claims alleging constitutional abuse by an agency.'" *People for the Ethical Treatment of Prop. Owners* v. *U.S. Fish & Wildlife Serv.*, 852 F.3d 990, 999–1000 (10th Cir. 2017) (alteration in original) (quoting *Burke* v. *Bd. of Governors of the Fed. Rsrv. Sys.*, 940 F.2d 1360, 1367 (10th Cir. 1991)).

14

When we review USDA's factual findings, we apply a substantial-evidence standard. *See* 5 U.S.C. § 706(2)(E). This standard of review is highly deferential. As we have explained,

> [s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The substantial evidence standard does not allow us to displace the agency's choice "between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] *de novo*."

*OXY USA*, 32 F.4th at 1044–45 (second and third alterations in original) (citation omitted) (quoting *Wyo. Farm Bureau Fed'n* v. *Babbitt*, 199 F.3d 1224, 1231 (10th Cir. 2000)).

## B

### 1

Fabrizius first urges reversal on constitutional grounds. The company brings two Due Process challenges related to the ICVI-related regulations. *First*, Fabrizius maintains the language of § 86.5(a), especially "persons responsible," is void for vagueness. *Second*, Fabrizius avers it lacked notice that it was among the "persons responsible" for ensuring horses moved from its premises to another state had ICVIs. Reviewing *de novo*, *see People for the Ethical Treatment of Prop. Owners*, 852 F.3d at 999–1000, we consider each Due Process claim in turn.

**a**

We begin with Fabrizius's void-for-vagueness arguments against § 86.5(a). Again, that section provides "[t]he persons responsible for animals leaving a premises for interstate movement must ensure that the animals are accompanied by an [ICVI] or other document required by this part for the interstate movement of animals." 9 C.F.R. § 86.5(a). According to Fabrizius, the statutory language leaves unclear "the real question – what makes a person responsible." Op. Br. at 9. Based on that alleged lack of clarity, Fabrizius argues this section "does not provide fair warning" and is therefore unconstitutionally vague. Op. Br. at 10. As we explain, we are not persuaded.

The Supreme Court has outlined the contours of a vagueness challenge. This "doctrine addresses at least two connected but discrete due process concerns." *FCC* v. *Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). First, "regulated parties should know what is required of them so they may act accordingly." *Id.* "[S]econd, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* To address these concerns, the Due Process Clause disallows any regulation that "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or [that] is so standardless that

16

it authorizes or encourages seriously discriminatory enforcement." *Id.* (quoting *United States* v. *Williams*, 553 U.S. 285, 304 (2008)).

"Some vagueness challenges contend a [regulation] is facially vague . . . . Other vagueness challenges claim [regulations] are vague as applied to particular parties in particular circumstances. 'As-applied vagueness challenges involve a factual dimension in that vagueness is determined "in light of the facts of the case at hand."'" *Wyo. Gun Owners* v. *Gray*, 83 F.4th 1224, 1234 (10th Cir. 2023) (quoting *United States* v. *Ochoa-Colchado*, 521 F.3d 1292, 1299 (10th Cir. 2008)).

As a preliminary matter, Fabrizius does not clarify whether it is bringing a facial or as-applied vagueness challenge. For completeness, we consider, and ultimately reject, both theories.

A regulation is not vague *facially* if it "has a 'plainly legitimate sweep,'" *Wash. State Grange* v. *Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *Washington* v. *Glucksberg*, 521 U.S. 702, 740 n.7 (1997) (Stevens, J., concurring)), or if it "delineates its reach in words of common understanding," *Jake's Fireworks Inc.* v. *Acosta*, 893 F.3d 1248, 1258 (10th Cir. 2018) (quoting *Brennan* v. *Occupational Safety & Health Rev. Comm'n*, 505 F.2d 869, 872 (10th Cir. 1974)). The regulation "need not spell out all situations where activity is" prohibited. *Id.*

17

A regulation is not vague *as applied* when "the standard is clear in light of the conduct to which it was applied." *Id.* "[T]he 'Constitution does not . . . impose impossible standards of specificity, and courts should remain ever mindful that general statements of the law are not inherently incapable of giving fair and clear warning.'" *Wyo. Gun Owners*, 83 F.4th at 1233 (quoting *Sperry* v. *McKune*, 445 F.3d 1268, 1271 (10th Cir. 2006)). "That there may be some borderline questions to decide is not fatal to" a regulation. *United States* v. *Villano*, 529 F.2d 1046, 1055 (10th Cir. 1976).

Particularly here, where only civil penalties are at issue, we find instructive that the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Vill. of Hoffman Ests.* v. *Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982). And it has observed "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation"—and, presumably, relevant regulations—"in advance of action." *Id.* at 498.

Applying these principles, we must reject Fabrizius's contention that § 86.5(a) is unconstitutionally vague. We readily conclude the law is not vague *facially*. It "has a 'plainly legitimate sweep.'" *Wash. State Grange*,

18

552 U.S. at 449 (quoting *Glucksberg*, 521 U.S. at 740 n.7 (Stevens, J., concurring)). For example, buyers and interstate-livestock-transportation companies—a central part of the regulation's "sweep"—would clearly be "persons responsible for animals leaving a premises for interstate movement." 9 C.F.R. § 86.5(a). And the regulation contains only "words of common understanding." *Jake's Fireworks*, 893 F.3d at 1258 (quoting *Brennan*, 505 F.2d at 872). That it does not "spell out all situations where activity is" prohibited does not render it unconstitutional. *Id.*

This regulation is also not vague *as applied*. Tellingly, the Judicial Officer had little trouble discerning § 86.5(a)'s meaning and applying it to the instant situation. *See* RII.333. APHA regulations define "person" as "[a]ny individual, corporation, company, association, firm, partnership, society, or joint stock company, or other legal entity." 9 C.F.R. § 86.1. Fabrizius Livestock, a corporation, clearly meets this definition.

The only other arguably vague term in this regulation is "responsible."[7] But that term is also not vague. The Judicial Officer proffered two dictionary definitions: "being a source or cause" and "being

---

[7] Fabrizius does not bring an argument challenging on constitutional grounds any of the following language: "for animals leaving a premises for interstate movement must ensure that the animals are accompanied by an [ICVI] or other document required by this part for the interstate movement of animals." 9 C.F.R. § 86.5(a).

the cause or explanation." RII.333 & n.36 (first quoting *Responsible*, *Webster's II New College Dictionary* (3d ed. 2005); and then quoting *Responsible*, *Merriam-Webster's Collegiate Dictionary* (11th ed. 2003)). That approach is reasonable; it clarifies the language "is clear," including "in light of the conduct to which it was applied." *Jake's Fireworks*, 893 F.3d at 1258. We take that same approach, but we use a dictionary from 2011, the closest edition available for a major English-language dictionary to the year of the final rule at issue (2013). *See* Traceability for Livestock Moving Interstate, 78 Fed. Reg. 2040 (Jan. 9, 2013). Like the Judicial Officer, we find "responsible," as used in § 86.5(a), means "[b]eing a source or cause." *Responsible*, *The American Heritage Dictionary of the English Language* (5th ed. 2011).

Nothing about this definition suggests unclarity as applied to Fabrizius's situation. While "responsible" may not be a mathematically precise term, "the 'Constitution does not . . . impose impossible standards of specificity, and . . . general statements of the law" can be sufficiently clear. *Wyo. Gun Owners*, 83 F.4th at 1233 (quoting *Sperry*, 445 F.3d at 1271). Our conclusion is reinforced by the less-searching standard the Supreme Court has endorsed for civil penalties from economic regulations of businesses—at issue here. *See Vill. of Hoffman Ests.*, 455 U.S. at 498 (finding these factors increase "[t]he degree of vagueness that the

20

Constitution tolerates" and decrease "the relative importance of fair notice and fair enforcement").

None of Fabrizius's contrary arguments persuade. Fabrizius first describes several borderline cases for which the regulation allegedly provides no clear answer, including, for instance, veterinarians, sellers to buyers who lie about the horses' destinations, and transporters at auctions. *See* Op. Br. at 10–13. But these hypotheticals do not move the needle for either possible type of vagueness challenge. Recall, we must reject a facial vagueness challenge if the regulation "has a 'plainly legitimate sweep.'" *Wash. State Grange*, 552 U.S. at 449 (quoting *Glucksberg*, 521 U.S. at 740 n.7 (Stevens, J., concurring)). If that condition is met—as it is here—our inquiry ends. Similarly, for an as-applied challenge, the relevant facts are those underlying the "conduct to which [the regulation] was applied," *Jake's Fireworks*, 893 F.3d at 1258—that is, that facts *in this case*, not the facts *in hypothetical future cases* not before us. Again, "[t]hat there may be some borderline questions to decide is not fatal." *Villano*, 529 F.2d at 1055; *see also Vill. of Hoffman Ests.*, 455 U.S. at 495 (noting a party "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others").

Fabrizius next contends *Colautti* v. *Franklin*, 439 U.S. 379 (1979), *abrogated on other grounds by Dobbs* v. *Jackson Women's Health Org.*, 597

21

U.S. 215, 276–77 (2022), requires us to find § 86.5(a) unconstitutionally vague. Op. Br. at 12. In *Colautti*, the Supreme Court found a statute criminalizing certain abortion-related procedures void for vagueness, in part because of "the absence of a scienter requirement." 439 U.S. at 390. Fabrizius argues the AHPA regulations also lack a *scienter* requirement for civil liability, suggesting they are similarly void for vagueness. Op. Br. at 12. *Compare* 7 U.S.C. § 8313(a)(1)(A)–(B) (imposing criminal liability on those who "knowingly" violate the AHPA), *with id.* § 8313(b)(1) (imposing civil liability on "*any person* that violates" the AHPA, with no *scienter* requirement (emphasis added)).

But *Colautti* is distinguishable. It dealt with criminal penalties for doctors, not civil penalties for businesses. 439 U.S. at 381; *see Vill. of Hoffman Ests.*, 455 U.S. at 498–99 (endorsing a less stringent vagueness test for civil penalties from economic regulations of businesses). And the Court found the lack of *scienter* merely "aggravated" already-existing ambiguities. 439 U.S. at 390. Here, in contrast, we find § 86.5(a)'s terms clear, and the regulation's lack of a *scienter* requirement does not change that conclusion.

Finally, Fabrizius assigns error to the ALJ's interpretation of "persons responsible," asserting that interpretation imposes liability on *only* "the seller, the buyer and the transporter" in a horse sale. Op. Br. at

22

8–11 (quoting RI.40). The company also asserts the ALJ's interpretation contains its own ambiguities and edge cases, "which only raises further questions, thus demonstrating the vagueness of the regulation itself." Op. Br. at 13.

At the outset, whether we can even reach these arguments is not immediately clear. Fabrizius "is appealing" only the Judicial Officer's order, *not* the two ALJ orders. Op. Br. at 1. Our jurisdiction to review USDA's proceedings is dictated by 7 U.S.C. § 8313(b)(4)(A), which allows review "under chapter 158 of Title 28." That chapter confers jurisdiction on "[t]he court[s] of appeals" to review "the order of the agency" described in the "petition for review." 28 U.S.C. § 2349(a). And the only order referenced in Fabrizius's petition for review is the Judicial Officer's.[8]

On the one hand, Fabrizius nowhere suggests the Judicial Officer explicitly invoked this particular part of the ALJ's reasoning as his own. On the other hand, a reasonable mind could view the Judicial Officer's order as implicitly incorporating *every* aspect of the ALJ's interpretation, including what Fabrizius specifically challenges here. *See, e.g.*, RII.334 (providing

---

[8] USDA does not make this jurisdictional point in its response brief. But cases are legion that, "[w]hether or not raised by the parties, we are obligated to satisfy ourselves as to our own jurisdiction at every stage of the proceeding." *M.S.* v. *Premera Blue Cross*, 118 F.4th 1248, 1261 (10th Cir. 2024) (alteration in original) (quoting *Alexander* v. *Anheuser-Busch Cos., Inc.*, 990 F.2d 536, 538 (10th Cir. 1993)).

reasons to support "[t]he ALJ's interpretation of the AHPA regulations"). While the question is close, we ultimately conclude the Judicial Officer's reliance on the ALJ's interpretation is sufficient to give us jurisdiction to reach these arguments.

On the merits, however, Fabrizius's arguments are unavailing. Fabrizius suggests "the ALJ stated that ['persons responsible'] clearly means the buyer, seller and transporter" and "*only* these three parties"—unduly excluding "other parties in the production system, including veterinarians." Op. Br. at 10 (emphasis added). But nowhere does the ALJ suggest *only* these three parties could be liable, and veterinarians and others could not be. He observes, "In the context of a commercial transaction, such as in the present case, the plain, ordinary meaning of 'persons responsible' means the seller, the buyer, and the transporter." RI.40. The critical word "only" is notably absent from that sentence. And that same order later calls § 86.5(a) "all encompassing," casting doubt on the notion that the ALJ intended to limit his interpretation to only three categories of actors. RI.41. Further, according to Fabrizius, the ALJ's interpretation left several ambiguities intact, "which only raises further questions, thus demonstrating the vagueness of the regulation itself." Op. Br. at 13. But, as discussed, the existence of edge cases under *other* sets of facts is not probative here.

24

Thus, § 86.5(a) is not unconstitutionally vague.

**b**

Fabrizius's second Due Process challenge to § 86.5(a) concerns notice. This challenge is closely related to the broader vagueness challenge. Recall, notice is one of the two animating principles underlying the void-for-vagueness doctrine. *Fox Television*, 567 U.S. at 253.

On this front, Fabrizius argues § 86.5(a) "failed to give [it] adequate notice that [it] was the responsible person for obtaining" ICVIs. Op. Br. at 18. USDA conducted no apparent "education campaign . . . to notify buyers and sellers that it was their responsibility to obtain health certificates." Op. Br. at 19 (citing RI.131); *see also* Op. Br. at 22–24 (quoting RI.99) (citing RI.245) (summarizing testimony to this effect). Ms. McMillan also testified the agency did not issue a warning letter before seeking to fine Fabrizius. Op. Br. at 20 (citing RI.151). Moreover, per Ms. McMillan, "the standard practice of an auction where horses may be sold" involves buyers obtaining ICVIs and other documentation for interstate transportation. Op. Br. at 20 (citing RI.145); *see also* Op. Br. at 20–22 (quoting RI.242, 244–45) (citing RI.226–27, 229–30, 236–39, 245) (summarizing similar testimony from a doctor who participates in livestock auctions). Under the circumstances, no one at Fabrizius knew "it was their responsibility, as the seller[,] to obtain a certificate." Op. Br. at 19.

The trouble with these arguments is they mainly concern whether Fabrizius had *actual* notice that it was liable under § 86.5(a). *See, e.g.*, Op. Br. at 24 (describing the mistaken "belief" of "Jason Fabrizius, Amanda McMillan," and a veterinarian who testified before the ALJ). The Supreme Court has "long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.'" *United States* v. *Apollo Energies, Inc.*, 611 F.3d 679, 690 n.5 (10th Cir. 2010) (quoting *Jerman* v. *Carlisle, McNellie, Rini, Kramer & Ulrich LPA,* 559 U.S. 573, 581 (2010)). Put differently, "due process does not require that citizens be provided actual notice of all criminal rules and their meanings." *United States* v. *Corrow*, 119 F.3d 796, 804 (10th Cir. 1997) (quoting *United States* v. *Vasarajs*, 908 F.2d 443, 449 (9th Cir. 1990)). We see no reason to hold otherwise in this case, simply because the notice issue arises in the context of civil penalties and administrative regulations. Thus, "[w]hat knowledge [Fabrizius] had of the [AHPA]'s provisions is irrelevant to our analysis." *Apollo Energies*, 611 F.3d at 690 n.5. Fabrizius's complaint that it was not specifically made aware it was among the "persons responsible" under § 86.5(a) thus falls short.

Insofar as Fabrizius instead argues, under these circumstances, *no person* would reasonably have notice, its arguments are similarly unpersuasive. As discussed, the regulation's terms are plain, such that

26

"regulated parties [w]ould know what is required of them." *Fox Television*, 567 U.S. at 253. The record leaves no doubt Fabrizius *itself* was aware *some* ICVI requirement existed, as it concedes it discussed that and similar requirements with buyers and posted on Facebook that buyers had to obtain ICVIs.[9] Fabrizius evidently construed the scope of the requirement differently than USDA. The company cites no authority to support its contention that USDA had to provide an education campaign, warning letters, or the like before seeking a fine. That buyers typically obtain ICVIs for horses sold at auction is irrelevant because, as USDA points out, the regulation's clear terms are decisive—and besides, none of the nineteen transactions here involved an auction. Resp. Br. at 28–29.

Fabrizius also alludes to testimony at the ALJ hearing that ICVIs "were only valid for thirty days," so if someone "quarantine[d] their horses in Colorado for" longer than that "prior to leaving state borders," "then another health certificate would be needed." Op. Br. at 18. The company also "clearly posted notice to buyers on their Facebook page that they were responsible for obtaining the" ICVIs. Op. Br. at 18. But the company fails to explain how these facts relate to the fair-notice inquiry, and we do not

---

[9] Fabrizius stopped this posting practice once it "learned" its understanding that only buyers "were responsible for obtaining" ICVIs was "not accurate." RI.139.

see how they are related. As USDA persuasively observes, the "quarantining in Colorado first" scenario is not implicated here in any event: "[t]he Judicial Officer noted, 'the ALJ found, and [Fabrizius] does not dispute . . . , that the horses [involved in the § 86.5(a) violations] were transported "directly" to states outside of Colorado.'" Resp. Br. at 21 (ellipses in original) (quoting RII.338).

We are sympathetic to the tenor of Fabrizius's arguments: that complying with the myriad applicable regulations, and understanding their reach, can be difficult for any business, and especially a small family business. But the Supreme Court has made clear "the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree"—and such instances frequently survive constitutional scrutiny. *Johnson* v. *United States*, 576 U.S. 591, 604 (2015) (alteration in original) (quoting *Nash* v. *United States*, 229 U.S. 373, 377 (1913)). That is true even when a regulation uses only a "qualitative standard," as this one does. *Id.* We therefore cannot say USDA acted unconstitutionally in enforcing § 86.5(a) against Fabrizius.

**2**

Fabrizius next argues, even if finding liability under § 86.5(a) passes *constitutional* scrutiny, USDA acted arbitrarily and capriciously in finding Fabrizius was among "[t]he persons responsible for animals leaving a

28

premises for interstate movement." 9 C.F.R. § 86.5(a); *see* Op. Br. at 14–17.
In contrast to our *de novo* review of Fabrizius's constitutional challenges,
our review here "is very deferential to the agency." *OXY USA*, 32 F.4th at
1044 (quoting *Hillsdale*, 702 F.3d at 1165). Accordingly, "[w]e may reject
the agency's interpretation only when the interpretation is unreasonable,
plainly erroneous, or inconsistent with the regulation's plain meaning." *Id.*
at 1052 (quoting *Biodiversity Conservation All.* v. *Jiron*, 762 F.3d 1036,
1060 (10th Cir. 2014)).

We begin by observing Fabrizius "does not dispute" the fifty horses at
issue "were transported 'directly'" from its premises "to states outside of
Colorado." RII.338 (quoting RI.43). Thus, there can be no dispute, in these
nineteen transactions, "animals le[ft] a premises for interstate movement."
9 C.F.R. § 86.5(a). Fabrizius also concedes all fifty horses lacked ICVIs. All
that is at issue, then, is whether Fabrizius is among the "persons
responsible" for those horses' "interstate movement." *Id.* And recall,
Fabrizius meets the regulatory definition of "person." *See id.* § 86.1. So the
dispositive inquiry is whether the Judicial Officer erred in finding Fabrizius
was among those "responsible" for the animals' interstate movement.

We discern no error. As the Judicial Officer summarized,

[t]he word "responsible" is commonly understood to mean "being
a source or cause." By use of the plural form, "persons," the
AHPA regulations reach beyond any single person responsible

29

> to encompass all persons involved in the process of "animals leaving a premises for interstate movement." In the context of commercial transactions like the ones at issue, an individual of ordinary intelligence would understand "persons responsible" to include the seller.

RII.333 (footnotes and citations omitted) (quoting *Responsible*, *Webster's II New College Dictionary* (3d ed. 2005)); *accord Responsible*, *The American Heritage Dictionary of the English Language* (5th ed. 2011) (providing the same definition in a more contemporaneous dictionary). This interpretation is not "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning." *OXY USA*, 32 F.4th at 1052 (quoting *Biodiversity Conservation All.*, 762 F.3d at 1060). We cannot find USDA's conclusion "runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. A dealer selling horses to buyers known to be from out of state can be reasonably deemed "responsible," under the word's plain meaning, for those horses' interstate movements.

While that plain meaning is decisive, two other factors the Judicial Officer discussed reinforce our conclusion. *First*, the notice of proposed rulemaking proposing this regulation would have applied liability to only "[t]*he person directly responsible*." RII.334 (quoting Traceability for Livestock Moving Interstate, 76 Fed. Reg. 50082, 50109 (Aug. 11, 2011)).

Following public comments, to clarify the rule would not "single out the accredited veterinarian or any other individual as being the primary responsible party in all cases," APHIS changed the regulatory language to the broader "persons responsible." RII.334 (quoting Traceability for Livestock Moving Interstate, 78 Fed. Reg. 2040, 2057 (Jan. 9, 2013)). This change clarifies § 86.5(a) "is not limited to the single person who is *directly* responsible for transporting the animals from the premises or writing the ICVI." RII.334. APHIS's evident intent to broaden the scope of liability under § 86.5(a) reinforces that horse sellers who know buyers are from another state are among those responsible for horses' interstate movement.

*Second*, the regulation defines "move" broadly to include "aid[ing], abet[ting], caus[ing], or induc[ing] carrying, entering, importing, mailing, shipping, or transporting," as well as "allow[ing] any of these activities." 9 C.F.R. § 86.1; *accord* 7 U.S.C. § 8302(12)(A)–(B) (providing a similarly broad statutory definition of "move"). By selling the fifty horses, Fabrizius at least "aid[ed], abet[ted], cause[d], or induce[d]" their "transport[ation]," or "allowed" it. 9 C.F.R. § 86.1. Indeed, as the Judicial Officer found, Fabrizius itself often "helped load the horses for transport."[10] RII.337.

---

[10] Fabrizius argues the affidavits establishing this fact are not credible because the people who prepared them have a material interest in Fabrizius being found liable. Op. Br. at 16. But the applicable substantial-evidence standard for factual judgments like this is too high for us to reject

Fabrizius's arguments to the contrary are unavailing. It first argues it cannot know where buyers will go after taking ownership and possession of the horses, making it not "responsible" for their being moved interstate. Op. Br. at 14–17. But § 86.5(a)'s plain meaning, as reinforced by the two factors already described, confirms *causing* the interstate movement suffices. By selling horses to buyers known to be from outside Colorado, Fabrizius caused those horses' interstate movement. Under that plain meaning, Fabrizius is indeed "responsible." Recall, § 86.5 carries no *scienter* or ownership requirement for civil liability. It only requires a person be among the "persons responsible[, *i.e.*, who are a source or cause,] for animals leaving a premises for interstate movement[, including people who cause, induce, aid, abet, or allow transportation across state lines, regardless of their *mens rea*]." 9 C.F.R. § 86.5(a). Fabrizius meets that broad definition.[11]

We thus cannot find the Judicial Officer erred in so holding, particularly

this factual finding because of purported bias. "Our function" in reviewing an agency order "is not to weigh the evidence or to evaluate the witnesses' credibility." *Gallagher* v. *NTSB*, 953 F.2d 1214, 1217 (10th Cir. 1992) (quoting *Sorenson* v. *NTSB*, 684 F.2d 683, 685 (10th Cir. 1982)); *see also F & H Coatings, LLC* v. *Acosta*, 900 F.3d 1214, 1221 (10th Cir. 2018) (similar).

[11] Further, the buyers' out-of-state addresses in these nineteen transactions, *see* RI.41, mean Fabrizius could not have claimed surprise when the horses moved directly across state lines. While Fabrizius suggests some out-of-state buyers sometimes keep horses in Colorado immediately after buying them, *see* Op. Br. at 18, it does not suggest it had any particular reason to expect that from these out-of-state buyers.

32

given the "very deferential" standard of review we apply to this challenge. *OXY USA*, 32 F.4th at 1044 (quoting *Hillsdale*, 702 F.3d at 1165).[12]

**3**

Finally, Fabrizius challenges the size of the fines USDA imposed. Recall, the ALJ imposed, and the Judicial Officer affirmed, a fine of $10,000 for each of (i) the fourteen CTESA violations (all together), (ii) the nineteen ICVI-related violations (separately), and (iii) the EIA-related violation—for $210,000 total. Fabrizius urges reversal on two grounds. *First*, it argues the fine is arbitrary and capricious. *Second*, it argues the fine is excessive under the Eighth Amendment. Neither argument is availing, as we explain.[13]

---

[12] What is more, § 86.5(a) merely requires that "[t]he persons responsible . . . *ensure* that the animals are accompanied by an [ICVI] or other document required by this part for the interstate movement of animals." 9 C.F.R. § 86.5(a) (emphasis added). Each "person[] responsible" therefore need not *procure* the ICVI themselves; they must merely "*ensure*" one is procured. This regulatory scheme imposes broad liability on *all* parties with a significant role in an animal's interstate movement to ensure at least one party procures an ICVI. *See* RII.336 (explaining this broad "understanding is consistent with the purpose of the AHPA—to prevent, detect, control, and eradicate diseases and pests of animals"). While we need not decide § 86.5(a)'s precise contours in this case, it is possible Fabrizius could have met its requirement by, for example, making buyers sign a document promising to obtain an ICVI if they would leave the state. But Fabrizius does not suggest it took any similar steps to *ensure* an ICVI was procured.

[13] In its opening brief, Fabrizius contests the "civil penalty of $210,000"—*i.e.*, its penalty for *all* of the AHPA *and* CTESA violations. Op. Br. at 2; *see also* Op. Br. at 2, 5, 6, 24, 28, 32 (referencing this penalty amount). But the $10,000 penalty for the fourteen CTESA violations is not

**a**

We begin with Fabrizius's arbitrariness challenge to the fines. Key to this inquiry is whether "the agency has relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. We also ask whether USDA offered "an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

As to the relevant "factors" and "important aspect[s]," *id.*, the AHPA is explicit about what factors USDA is to consider in deciding on civil penalty amounts. The Judicial Officer was similarly clear about the factors on which he relied. We thus begin by walking through the statutory factors and the Judicial Officer's reasoning as to each.

The AHPA lists four factors USDA "shall"—*i.e.*, must—"take into account": the violations' (i) "nature," (ii) "circumstance," (iii) "extent," and (iv) "gravity." 7 U.S.C. § 8313(b)(2). The Judicial Officer discussed each one.

---

properly before us. As USDA clarifies, Fabrizius does not challenge—and, jurisdictionally, likely *could not* challenge—its liability under the CTESA in this appeal. *See* Resp. Br. at 1 n.1 (noting the CTESA, unlike the AHPA, does not allow "direct review in the courts of appeals under 28 U.S.C. § 2342; instead, review would be had in the appropriate district court under 28 U.S.C. § 1331"). Fabrizius's reply brief once references "a $250,000 fine." Reply Br. at 15. That value's source is unclear. We now clarify the fines we can review total $200,000.

34

On (i), he found "[t]he nature of the violations is extremely serious." RII.344. Failing to obtain ICVIs and moving an EIA-positive horse across state lines "undermined USDA's animal disease control efforts and posed a threat to animal health." RII.344; *see also* 7 U.S.C. § 8301(1)(A) (confirming concern for protecting "animal health" underlies the AHPA).

On (ii), the Judicial Officer found "[t]he circumstances of the violations also favor the" $200,000 penalty because Mr. Fabrizius "is an experienced horse dealer" who knew a lot about horse-related documentation and disease-testing requirements, making his failures especially obvious. RII.344–45. "Moreover," the Judicial Officer continued, Fabrizius's "conduct is made more egregious by its own awareness of the high risk that the horses it was selling and allowed to leave its premises without ICVIs were exposed to disease." RII.345.

On (iii), the Judicial Officer found "[t]he extent of the violations also supports the civil penalty assessment" as the § 86.5 violations "involved 50 horses, 19 separate transactions, and multiple out-of-state buyers"—all "over a short period of time." RII.345–46; *see also* RI.17–23 ¶¶ D, F–R, T–X (confirming the § 86.5 violations all occurred between June and October 2018).

And on (iv), he found "that the gravity of the violations is great" because Fabrizius's failures concerning the EIA-positive horse "created a

35

very serious risk" and the sixty-seven untraced horses "could still be transmitting the disease." RII.346. Fabrizius's ICVI failures were especially serious because "the horses that left its premises without ICVIs were particularly vulnerable to disease exposure." RII.346. "Further," he reasoned, "the potential impact [Fabrizius]'s conduct could have had on the international equine market cannot be ignored," as disease risk and poor traceability hinder the valuable horse-export market. RII.347.

The AHPA next lists five factors USDA "may consider": "(A) the [violator's] ability to pay; (B) the effect on ability to continue to do business; (C) any history of prior violations; (D) the degree of culpability; and (E) such other factors as the Secretary considers to be appropriate." 7 U.S.C. § 8313(b)(2)(A)–(E). On (A) and (B), the Judicial Officer agreed with the ALJ's assessment of the evidence on Fabrizius's finances "as 'confusing and ambiguous, at best.'" RII.347 (quoting RII.318). The business and personal tax returns in the record painted unclear and conflicting pictures, made even more opaque by Mr. Fabrizius's "comingling of business and personal expenses." RII.347–48. Based on this evidence, the Judicial Officer concluded he "cannot find that the record reflects an inability to pay or effect on [Fabrizius]'s ability to continue to do business to warrant a reduction of the civil penalty assessed by the ALJ." RII.348.

36

On (C), the Judicial Officer acknowledged Fabrizius "had no prior violations." RII.349. Still, a reduction of the civil penalty was not warranted, the Judicial Officer reasoned, "given the nature and circumstances of the violations in this proceeding." RII.349.

On (D), the Judicial Officer agreed with the ALJ that Fabrizius "is 'highly culpable.'" RII.348 (quoting RII.316). Mr. Fabrizius has been "in the horse business his whole life," and "[h]e was well-experienced in buying and selling horses and was aware of relevant regulations governing the horse industry" and attendant "paperwork requirements." RII.348–49. Fabrizius "also knew that the horses it advertised for sale were at high risk of disease exposure." RII.348–49.

The Judicial Officer did not address discretionary factor (E), the catchall for "other factors." *See* RII.347–49.

In sum, the Judicial Officer considered all mandatory factors and all discretionary factors except the catchall for "other factors." He thus did not "entirely fail[] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. He did not apparently consider any impermissible factors, so we cannot find he "relied on factors which Congress has not intended [him] to consider." *Id.* He reasonably found all mandatory factors, and three of the four discretionary factors he considered, support a nontrivial penalty. And we cannot say his explanation "runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* Nothing in this analysis is "unwarranted in law or without justification in fact," so "we [may] not overturn [the] agency's choice of sanctions." *Chapman* v. *U.S. Dep't of Health & Hum. Servs.*, 821 F.2d 523, 529 (10th Cir. 1987) (citing *Butz* v. *Glover Livestock Comm'n*, 411 U.S. 182, 185 (1973)).[14]

Fabrizius's contrary arguments are unavailing. It first complains about the lack of a "clear formula" or "specifics on how the fine was determined." Op. Br. at 25; *see also* Op. Br. at 26 (faulting USDA for not using a "standardized worksheet, training or protocols to determine the fine"); Op. Br. at 27 (faulting USDA for not explaining "the process by which all these parties determine the actual number of the fine recommended"). But the company cites no authority requiring a formula or additional explanation. "[R]eviewing courts are generally not free to impose"

---

[14] Notably, the maximum penalty in this case was $340,131 per violation and $569,468 total. *See supra* note 4. These $10,000 fines thus constituted about 2.9% of the maximum per-violation fine, and the $200,000 total fines constituted about 35.1% of the maximum per-proceeding fine. It is *at least arguable* that, mirroring the CTESA, USDA could have determined each *horse sold*, rather than each *transaction*, to constitute a violation of AHPA regulations. In that case, given fifty horses sold without ICVIs and one sold without adequate diligence to discover its EIA infection, Fabrizius would have committed fifty-one violations instead of twenty. At the same $10,000 per violation, USDA then could have imposed a 255% larger total AHPA fine: $510,000.

"additional procedural rights" "if the agencies have not chosen to grant them." *Vt. Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council*, 435 U.S. 519, 524 (1978). We also doubt if much more precision would be possible as each statutory factor is qualitative and open to varying interpretations.

Fabrizius next insists its financial condition should have received more import in the fine analysis, and some testimony suggests this fine will put Fabrizius out of business. Op. Br. at 27–28. But substantial evidence supports the Judicial Officer's conclusion that the record evidence does not "reflect[] an inability to pay or effect on [Fabirizius]'s ability to continue to do business." RII.348. Other evidence points in the opposite direction; for instance, Fabrizius "invested more than $340,000 for business upgrades since 2018 and deducted 100% of the purchases." RII.348. "[A] reasonable mind might accept" this evidence "as adequate to support" the Judicial Officer's "conclusion" about Fabrizius's finances—all that is required under the deferential standard applicable here. *OXY USA*, 32 F.4th at 1044. We may not "displace the agency's choice 'between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] *de novo*.'" *Id.* at 1044–45 (alterations in original) (quoting *Wyo. Farm Bureau Fed'n*, 199 F.3d at 1231). And besides, these two ability-to-pay-related factors are discretionary. *See* 7 U.S.C. § 8313(b)(2)(A)–(B). So we could not accept Fabrizius's argument without

impermissibly "substitut[ing our] judgment" on how to weigh these *nonmandatory* factors "for that of the agency." *State Farm*, 463 U.S. at 43.

Fabrizius then urges us to consider mitigating factors the penalty apparently does not reflect: the violations constituted "a first offense"; Fabrizius has since taken "remedial steps . . . to address the concerns raised by the agency"; and Fabrizius had performed an EIA test on the EIA-positive horse, even if too late, and testimony suggests that test may have mitigated the resulting damage. Op. Br. at 28–30. The second and third of these do not appear to be statutory factors, *see* 7 U.S.C. § 8313(b)(2)(A)–(E), so we cannot find the Judicial Officer erred by not considering them. And the Judicial Officer *did* observe this was Fabrizius's first offense, but he found other factors overcame that single discretionary factor to justify a nontrivial penalty. RII.349.

Finally, Fabrizius alleges most of USDA's concern lies with the one horse with EIA; "[t]he record shows little impact for the 50 horses that left the state without veterinary certificates." Reply Br. at 20. To the contrary, the Judicial Officer noted even poor traceability from ICVI failures can have a high "potential impact . . . on the international equine market." RII.347. That invokes Congress's concern for "the economic interests of the livestock and related industries" and "interstate . . . and foreign commerce . . . in animals and other articles." 7 U.S.C. § 8301(1)(C), (E). It is easy to see how

poor equine-disease traceability can hinder both goals, as the Judicial Officer reasonably explained. And besides, a slight impact from *some* violations is, at most, one factor among many, and we cannot disturb the Judicial Officer's reasonable balancing of *all* factors.[15]

Thus, we find the $200,000 fine under review is not arbitrary or capricious.

**b**

Fabrizius's challenge to the fines under the Eighth Amendment's Excessive Fines Clause likewise lacks merit. We review constitutional regulatory issues *de novo. See People for the Ethical Treatment of Prop. Owners*, 852 F.3d at 999–1000. But we still apply a deferential substantial-evidence standard to underlying factual findings. *See OXY USA*, 32 F.4th at 1044–45; *cf. United States* v. *Wagoner Cnty. Real Est.*, 278 F.3d 1091, 1102 (10th Cir. 2002) (citing *United States* v. *Bajakajian*, 524 U.S. 321, 336 n.10 (1998)) (applying a "clearly erroneous" standard to a district court's factual findings underlying an Excessive Fines Clause ruling).

---

[15] Fabrizius's analogy to *Corder* v. *United States*, 107 F.3d 595 (8th Cir. 1997), falls short. *See* Op. Br. at 29–30. Besides being out of circuit, *Corder* involves USDA levying the *maximum* fine against a food-stamp trafficker based on a *formula* that weighed an impermissible mix of *extrastatutory* factors. *Corder*, 107 F.3d at 597–98. Here, in contrast, USDA used *no formula*, balanced *statutory* factors, and imposed a fine *well below the statutory maximum*.

Fabrizius argues the $200,000 penalty violates the Excessive Fines Clause. The Eighth Amendment reads, "Excessive bail shall not be required, *nor excessive fines imposed*, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII (emphasis added).

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Bajakajian*, 524 U.S. at 334. More specifically, "[i]f the amount of the forfeiture is *grossly* disproportional to the gravity of the defendant's offense, it is unconstitutional."[16] *Id.* at 337 (emphasis added).

To test for gross disproportionality, the *Bajakajian* "Court examined several factors. One of the most important was Congress's judgment about the appropriate punishment," as indicated mainly by the "[m]aximum statutory fines." *Wagoner Cnty.*, 278 F.3d at 1100. We, in turn, have approvingly cited an Eleventh Circuit case holding "if the value of forfeited property is within the range of fines prescribed by Congress, a strong presumption arises that the forfeiture is constitutional." *Id.* (quoting *United*

---

[16] While much of the caselaw on the Excessive Fines Clause, including *Bajakajian*, is about forfeitures, not fines as such, these forfeiture cases apply to fines. The *Bajakajian* Court treated the forfeiture at issue as "a 'fine' within the meaning of the Excessive Fines Clause." 524 U.S. 321, 334 (1998). The $200,000 penalty on review is similarly a "fine" within the meaning of the Eighth Amendment; no party contends otherwise.

*States* v. *817 N.E. 29th Dr.*, 175 F.3d 1304, 1309 (11th Cir. 1999)). "Additional factors for consideration of the gravity of the offense include the extent of the [unlawful] activity, related illegal activities, and the harm caused to other parties."[17] *Id.* (citing *Bajakajian*, 524 U.S. at 337–39).

We begin with the preeminent factor: "Congress's judgment about the appropriate punishment." *Id.* At Fabrizius's own admission, "a sizeable gap between the penalty imposed and the maximum penalty in the statute" exists.[18] Reply Br. at 22. At the outset, therefore, "a strong presumption arises that the forfeiture is constitutional." *Wagoner Cnty.*, 278 F.3d at 1100 (quoting *817 N.E. 29th Dr.*, 175 F.3d at 1309). The dispositive question becomes whether other *Bajakajian* factors overcome this "strong presumption."

They do not. As discussed, the unlawful conduct supporting Fabrizius's liability was extensive, involving fifty horses across nineteen

---

[17] This court has "suggested other considerations" to supplement "the *Bajakajian* factors." *United States* v. *Wagoner Cnty. Real Est.*, 278 F.3d 1091, 1101 (10th Cir. 2002). But each of those "other considerations" is relevant only to the forfeiture context, *see id.*, so we need not consider them here.

[18] Fabrizius argues these maximum penalties are reserved for "large scale corporation[s]," not "a small family run business," so the fine in this case should be judged relative to a lower maximum amount. Reply Br. at 22. But Fabrizius cites no authority for that contention, so we are unpersuaded.

transactions. Multiple regulatory failures occurred in a short period, involving two AHPA regulations and one CTESA regulation. And substantial evidence supports the Judicial Officer's factual finding that Fabrizius's "violations posed a threat to the health and economic vitality of the U.S. equine industry." RII.353. Thus, all *Bajakajian* factors—including the critical "Congress's judgment" factor—confirm this $200,000 fine is constitutional.

Fabrizius resists this conclusion. The company points to APHIS seeking a higher penalty after substituting the company for Mr. Fabrizius as the Respondent. Op. Br. at 31–32. But USDA correctly observes "Fabrizius Livestock, an experienced and active horse trader, was plainly among the class of persons for whom the regulations were intended"— meaning fining that company, and not the individual, is consistent with Congress's intent. Resp. Br. at 37.

Fabrizius next suggests, in contrast to the EIA-related § 71.3(f) violation, the ICVI-related § 86.5(a) violations caused little harm, especially because Fabrizius undertook voluntary traceability-focused measures even where not required—making the identical $10,000 fines for each violation difficult to defend. Op. Br. at 32–35. But USDA is again correct that the Eighth Amendment only "requires that no single offense be punished excessively"; that the allegedly more-serious § 71.3(f) violation and the

44

nineteen allegedly less-serious § 86.5(a) violations each carried an identical $10,000 fine, of itself, does not have constitutional consequences. Resp. Br. at 39.

Fabrizius insists the fine "would force [Mr. Fabrizius] out of business." Op. Br. at 35. That is relevant to the constitutional inquiry. *See Bajakajian*, 524 U.S. at 335 ("Magna Charta . . . required only that amercements (the medieval predecessors of fines) should be proportioned to the offense *and that they should not deprive a wrongdoer of his livelihood*." (emphasis added)). And we are sympathetic to this possibility. But the party alleging an Eighth Amendment violation bears the burden to demonstrate gross disproportionality. *Wagoner Cnty.*, 278 F.3d at 1101 n.8. And, as explained above, substantial evidence supports the Judicial Officer's conclusion that the record does not support finding Fabrizius cannot pay. *See* RII.348. We thus cannot find Fabrizius has made the required showing here.

Thus, the fine is not excessive under the Eighth Amendment.

## III

We DENY the petition for review.

45